IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ROGER B. PARKER, et al.          :          CIVIL ACTION
                                 :
        v.                       :          No.: 06-2002
                                 :
LONG BEACH MORTGAGE              :
    COMPANY, et al.              :

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                   **January 3, 2008**

The dispute Roger and Sally Parker have with a broker and four lending institutions embodies

many of the factors identified with predatory, subprime mortgage loans:[1] an aggressive mortgage

broker, no document loans, interest climbing to double-digit rates, escalating payments, balloon

payments, prepayment penalties, and negative amortization.  As distasteful as the practices may be,[2]

that odor of opportunism is not enough to save the Parkers, relatively sophisticated borrowers, from

themselves.

The testimony of the Parkers was insufficient to overcome the paper trail presented by the

seven Defendants in a bench trial on the Parkers' Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*,

RESPA[3], and state law claims against Long Beach Mortgage Company; Washington Mutual Home

Loans; MortgageIT, Inc.; HSBC Bank, U.S.A. N.A.; Countrywide Home Loans, Inc., and the broker,

---

[1]HUD-Treasury Joint Report, http://www.hud.gov/library/bookshelf12/pressrel/treasrpt.pdf (last visited January 4, 2008).

[2]The power to curb predatory practices lies either in consumer education or with Congress; as a court of limited jurisdiction, I may only enforce the laws as written, not as I would wish they were written.

[3]Real Estate Settlement Practices Act, 12 U.S.C. § 2605 *et seq*

1

Lancealott Financial Group, Inc.  At the close of the Parkers' case, I found the Parkers failed to present sufficient credible testimony or evidence to support their claims and I granted Defendants's Motions pursuant to Federal Rule of Civil Procedure 52(c).

**FINDINGS OF FACT[4]**

The Parkers assumed four mortgage loans in October and November, 2005, two on a townhouse in West Conshohocken, Pennsylvania, and two refinancing their home in Blue Bell, Pennsylvania.  The Parkers are college-educated business owners who have bought, financed, and sold two prior homes.  Sally Parker had completed her studies for her Real Estate Broker's license and was ready to take the examination at the time she attended the first settlement in October, 2005. Ex. 46, unnumbered p. 11.

When they decided to buy a smaller house on Nathan's Place, West Conshohocken, the Parkers used the services of a mortgage broker, Lancealott Financial Group Inc.  The Parkers asked for a no-document loan, allowing them to borrow on their stated income rather than their proved income.  The Parkers could not produce tax returns for the prior year because the forms had not been filed. Sally Parker testified she and her husband have credit scores in the high 600s and in the 700s respectively but were looking for a no-document loan because "we have a lot of write-offs," so their tax returns "don't look so great."  Sally Parker told Jack Weinstein, the broker at Lancealott, the terms of a mortgage to buy Nathan's Place were important to them, and she hoped to spend about $1700 a month on the new mortgage.

Almost a  month before settlement, the Parkers received Early Disclosures from Long Beach Mortgage Company.  Roger Parker's hand-written notes, "on Sept 18 with [sic] finally got our good

---

[4]Pursuant to Federal Rule of Civil Procedure 52(a).

faith estimate, two loans at 8.77% and 10.534%," Ex. 46, unnumbered p. 20, contradict Sally Parker's testimony she opened the package "about a week before settlement and had a fit." Sally Parker testified she did not know the mortgage for Nathan's Place would be stated as two loans, one for 80 percent of the purchase price and the other for 20 percent of the purchase price.

The package the Parkers received included seven documents from Long Beach Mortgage Company, the cover letter of which was stamped in red "EARLY DISCLOSURE." Ex. 15. The first was a preliminary Truth-in-Lending disclosure itemizing:

- an 8.7 percent annual credit rate;

- a total finance charge for the length of the loan of $634,636.12;

- a loan amount of $334,723.50;

- total payment of $969,259.62; paid as

- 24 payments of $2,226.72 monthly beginning November 1, 2005;

- six payments of $2,668.44 monthly beginning November 1, 2007;

- 330 payments of $2,726.69 monthly beginning May 1, 2008;

- a disclosure of the variable rates

- a disclosure which said "If you pay off your loan early, you will not have to pay a penalty." Ex. 15.

The Truth in Lending disclosure also defines annual percentage rate, prepaid finance charges, finance charge, amount financed, total of payments, and payment schedule. The second document Long Beach supplied the Parkers was a RESPA Servicing Disclosure which revealed Long Beach's intent to reassign the Parkers' loan and its servicing. The Parkers also received in the mailing a disclosure of a "2 year fixed/adjustable rate loan principal dwelling program disclosure." Ex. 15.

3

The document states under a heading "HOW YOUR INTEREST RATE CAN CHANGE" that "[t]he initial rate will be fixed for the first two year period, and may adjust every six months thereafter.' Ex. 15, WM-104.  Long Beach Mortgage told the Parkers they could receive Long Beach's "best price" for a loan if they accepted a prepayment penalty and verified their income.  The good faith document shows the purchase price as $426,952.00 and a loan amount of $341,561.00.

The Parkers also received an Early Disclosure packet for the small loan, showing a fixed rate loan of $84.110.70 at 10.534 percent payable in 360 payments of $771.55 with no prepayment penalty.

Sally Parker testified she only attended the settlement for Nathan's Place to protect her deposit on the townhouse.  She stated she never intended to go through with settlement on the terms in the early disclosure packet.  During settlement, a telephone call was made to Washington Mutual, seeking promises of a "better rate."  The Parkers admitted the builder of Nathan's Place, from whom they were buying the house, was willing to delay settlement to allow the Parkers time to find a mortgage with better terms.  Sally Parker claims she was prepared to leave settlement but stayed because Weinstein told her she had to go through with this settlement to get the better rates later. Sally Parker testified she only learned there were two loans after settlement when she went home and "went through the papers."  Her testimony is contradicted by the documents the Parkers signed at settlement.

Both Parkers testified they had time and an opportunity to review all the documents they signed at settlement. On October 14, 2005, both Parkers signed and initialed each page of two loan applications with a stated monthly income of $30,000. Ex's 12 and 13.  The Parkers received good faith estimates of closing costs and HUD-1 documents for both loans.  Ex's 21, 22, 23, and 24.

4

Roger Parker signed the Truth-in-Lending statement at settlement which showed:

- an 9.279 percent annual percentage rate;

- a total finance charge for the length of the loan of $650,238.54;

- a loan amount of $325,696.74;

- total payment of $975,935.28; paid as

  - 24 payments of $2,507.67 monthly beginning December 1, 2005; and,

  - 336 payments of $2,725.45 monthly beginning December 1, 2007;

- a disclosure of the variable rates; and,

- a disclosure which said "If you pay off your loan early, you may have to pay a penalty."

Ex. 25.  Roger Parker also signed at settlement a Truth-in-Lending Disclosure Statement for the smaller loan showing a loan amount of $82,081.10 payable at 10.494 percent in 360 monthly payments of $750.48.  The statement shows no variable rate feature but it does show a prepayment penalty.  Ex. 27.

Roger Parker also signed a "Notice Regarding Your Transaction" which described the loan as an 80/20 transaction with 80 percent of the purchase price as a first lien and 20 percent as a second lien.  When he signed, Roger Parker confirmed he understood the transaction included "two separate sets of loan documents, including two separate loan agreements and two separate securing agreements."  Ex. 28, WM-587.  The notice also discloses the possibility of a prepayment penalty and directs the borrower in capital letters to "CHECK YOUR PROMISSORY NOTE BEFORE YOU SIGN TO CONFIRM WHETHER YOUR LOAN INCLUDES A PREPAYMENT FEE."  Ex.. 28, WM-587.

5

At settlement for Nathan's Place, Roger Parker also signed an Occupancy Agreement to occupy the property as his primary residence for the 12-month period immediately following the loan closing. The Agreement defines (in bold-faced capital letters) failure to occupy the property as the primary residence as a default under the Note and Security Instrument. Ex. 29. Roger Parkers also signed a RESPA Servicing Disclosure, Ex. 30; an affiliation disclosure, Ex's 31 and 33; and, a nonrefundable fee disclosure, Ex. 32;. Both Parkers signed and initialed each page of the Mortgage. Ex. 34. Roger Parker signed the Fixed/Adjustable Rate Disclosure. Only Roger Parker signed the Promissory Note which included a notice of a prepayment penalty of three percent of the total amount borrowed if made in the first year of the loan and two percent in the second year of the loan. Both Parkers signed the documents escrowing a portion of the settlement funds for the completion of the builder's punch-list. The Parkers received a check for $40,166.38, the amount by which the two loans exceeded the amount owed the builder for Nathan's Place.   Ex. 23.

Six days before settlement on Nathan's Place, and around the same date Sally Parker testified she "had a fit" over the terms of the Nathan's Place loans, the Parkers completed a Universal Residential Loan Application to mortgage their Willowbend Road, Blue Bell, home for $675,000. On November 1, 2005, the Parkers completed a second Uniform Residential Loan Application to borrow $129,000 against the Willowbend Road home. Both applications stated the property would be the primary residence. On October 11, 2005, MortgageIT prepared documents including an adjustable rate mortgage disclosure, federal Truth-in-Lending disclosure statement containing disclosure of the prepayment penalty, a good faith estimate of closing costs and the amount financed under RESPA, a statement of information "about your loan," stating, "You understand if you make a full Prepayment or a partial Prepayment, the Note Holder WILL assess a Prepayment Penalty."

6

Ex. 53 (emphasis in original). Sally Parker acknowledged making notations on the Good Faith Estimates of closing costs, amount financed, rates, and estimated payments for the loan on Willowbend Road.  On November 5, 2005, MortgageIT prepared a similar packet for the smaller loan, a home equity line of credit, on Willowbend Road.

At settlement on November 14, 2005, Sally and Roger Parker initialed each page and signed an Adjustable Rate Note including a "Prepayment Penalty Addendum," the Mortgage, the Settlement Statement, and the Truth-in-Lending Disclosure Statement.  Roger Parker signed an Owner Occupancy Agreement and the closing instructions.  Ex.'s 59, 60, 62, 65, 66, and 67.  Both Sally and Roger Parker separately signed two copies of the Notice of Right to Cancel, giving them until November 17, 2005 to cancel the loan and acknowledging each received two copies of the notice of Right to Cancel.  Ex.'s 69, 70, 71, and 72.  Roger Parker signed and initialed a loan application and the Note with Balloon Payment.  Ex. 74.  For the smaller loan of $129,000 on the Willowbend Road home, both Roger and Sally Parker signed the Balloon Payment Disclosure, the second Mortgage, the Truth-in-Lending Disclosure.  Ex.'s 75, 76, 78, 79, and 80.  Roger Parker signed the Owner Occupancy Agreement and the closing instructions.  Ex.'s 81 and 82. Both Parkers signed the Notice of Right to Cancel.  Ex.'s 83 and 84.

When the Parkers re-financed the Willowbend Road property, the original mortgage and the SBA loan were paid off, and the Parkers received $54,118.90 in cash.  Roger Parker testified they reduced their monthly payments from $5,200 a month to $2,600 a month.  He said he believed they could afford to pay only the interest on the larger loan on Willowbend because he assumed the house was appreciating by three thousand dollars a month.  Roger Parker said he had not read the paragraph in the Adjustable Rate Note he initialed and signed which explained interest rates change more

frequently than monthly payments.  The Note states, "[f]or each month that my monthly payment is

less than the interest portion, the Note Holder will . . . add the difference to my unpaid Principal, and

interest will accrue on the amount of this difference at the interest rate required by Section 2."  Ex.

59, p. 2.  In effect, Roger Parker expected to borrow more money than they had outstanding on

Willowbend Road at a higher interest rate but to pay less each month without consequence.  In

reality, Roger Parker testified, the result has been "catastrophic."

I do not find credible the Parkers' claim they did not know each financing was structured as

two loans.  The Parkers acknowledged receiving documents a month before settlement on Nathan's

Place, and at least at settlement for Willowbend Road, if not before, clearly delineating two loans

for each property.  The Parkers signed two mortgages and two notes at each settlement, one 80

percent of the financed amount, and the other 20 percent of the financed amount.  Their initials and

their signatures on each document belie their claims.

The Parkers filed suit May 12, 2006.  The Parkers'  Second Amended Complaint contains

four counts.  Count I alleges Long Beach, Washington Mutual, MortgageIT, Countrywide, HSBC,

and Indymac, violated.15 U.S.C. §1638(a)[5] by failing to disclose the loans were structured as two

---

[5]The statute reads:
§ 1638. Transactions other than under an open end credit plan
    (a) Required disclosures by creditor
    For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:
        (1) The identity of the creditor required to make disclosure.
        (2)(A) The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1) of this section:
            (i) take the principal amount of the loan or the cash price less downpayment and trade-in;

loans on each property, failing to disclose all the finance charges, and failing to provide eight copies

of the Notice.[6]   Count II charges the same four defendants with fraudulent misrepresentation for

refusing to recognize the Parkers' right of rescission under 15 U.S.C. § 1635.[7]   Count III charges

---

> (ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and
> (iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.

15 U.S.C. § 1638

[6]Actions for violations of the TILA may be maintained against any assignee of the original creditor so long as the violation for which suit has been instituted was "apparent from the face of the disclosure statement . . ."  15 U.S.C. § 1641(a).

[7]The statute reads:
§ 1635. Right of rescission as to certain transactions
> (a) Disclosure of obligor's right to rescind
> Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.
> (b) Return of money or property following rescission
> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created

Washington Mutual, Countrywide, and Indymac with failing to respond to the Parkers' qualified

written requests under RESPA, 12 U.S.C. §§ 2605(e) and (f).[8]  Count IV charges Lancealott

Financial Group Inc. with fraud and violations of Pennsylvania's Credit Services Act, 73 Pa.C.S. §§

---

under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

(c) Rebuttable presumption of delivery of required disclosures

Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

15 U.S.C. § 1635.

[8]The statute reads:

e) Duty of loan servicer to respond to borrower inquiries

    (1) Notice of receipt of inquiry

        (A) In general

        If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

        (B) Qualified written request

        For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that–

            (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

            (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605 (e)

2183(3), 2184, 2185, and 2186 and the Loan Broker Trade Practices Regulations, 37 Pa. Code §§ 305.3(a)(1) - (a)(4).

## CONCLUSIONS OF LAW

Rule 52(c) provides that "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim . . . that cannot under the controlling law be maintained." Fed. R. Civ. P. 52(c). In entering judgment pursuant to Rule 52(c), I must weigh the evidence, resolve any conflicts in it, and decide where the preponderance lies. *Giant Eagle, Inc. v. Fed. Ins. Co.*, 884 F. Supp. 979, 982 (W.D . Pa. 1995) (citing 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: Civil 2d, § 2573.1); *see also United Techs. Corp. v. Chromalloy Gas Turbine Corp.*, 105 F. Supp. 2d 346 (D. Del. 2000).  I also assess the credibility of witnesses to determine whether or not the plaintiff s have demonstrated a factual and legal right to relief by a preponderance of the evidence. *Rego v. ARC Water Treatment Co. of PA.*, 181 F.3d 396, 399 (3d Cir. 1999) (holding that the district court can resolve disputed factual questions under Rule 52(c)).  Credibility determinations alone are insufficient to satisfy the requirements of Rule 52(c).  *Newark Branch NAACP v. City of Bayonne*, 134 F.3d 113 (3d Cir.1998) (holding the district court must make findings of fact adequate to understand the basis for its decision).

To prove their claims under the Truth-in-Lending Act, the Parkers must overcome the rebuttable presumption of the delivery of the required disclosures.  15 U.S.C. § 1635(c). The Congressional purpose of TILA was to inform the consumer of the true cost of credit.  TILA and its implementing Regulation Z require lenders  to disclose clearly and conspicuously to consumers terms material terms of their loans.  *In re Escher*, 369 B.R. 862, 870 (Bankr. E.D. Pa. 2007) (citing

11

*Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980)).

The right of rescission generally arises under section 1635. Under this subsection, creditors are required to disclose rescission rights to their obligors and to inform them the right to rescind is open for three business days following the transaction. If no notice is given, a consumer has three years in which to rescind. 15 U.S.C. § 1635(f); *see also*, 12 C.F.R. § 226.23(a)(3).

A borrower's testimony that disclosures were not provided, without more, is insufficient to rebut the presumption that disclosure occurred where there is written acknowledgment of receipt. *McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1011 (7th Cir. 2004) (finding mere assertion of non-receipt insufficient to rebut written evidence that disclosures were provided); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1054 (8th Cir. 2003) (finding allegations that disclosures were not provided insufficient to rebut presumption) as cited in *Strang v. Wells Fargo Bank, N.A.*, 2005 WL 1655886, *3 (E.D. Pa. July 13, 2005).

When asked to point to a finance charge not accurately reflected on the TILA disclosure form, Sally Parker suggested the yield spread premium paid to Lancealott was not properly disclosed as a finance charge. A "yield spread premium" is a bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan. The lender then rewards the broker by paying it a percentage of the yield spread (*i.e.,* the difference between the interest rate specified by the lender and the actual interest rate set by the broker at the time of origination) multiplied by the amount of the loan. *In re Escher,* 369 B.R. at 870-71 (citations omitted). The Federal Reserve Board has ruled fees paid "to a broker as a 'yield spread premium' already included in the finance charge, either as interest or as points, should not be double counted" on the TILA Disclosure Statement. *Stump v. WMC Mortg. Corp.*, 2005 WL 645238, *4 (E.D. Pa.

12

March 16, 2005).  The HUD-1 settlement sheet shows a yield spread premium to Lancealott of $9,987.08 paid by Lender.  Ex. 23, WM-0017.   The premium and its source were properly disclosed.

The Parkers claims, even if they were credible, which they are not, that they do not remember receiving the required notices are insufficient to overcome the presumption that they received the required number of copies of the Truth-in-Lending notices.   The Parkers signed four TILA documents acknowledging they did in fact receive two copies of each notice.  Despite the Parkers testimony, the documents and their own notes demonstrate they knew a month before settllement the loan would be structured as two loans, and that they were paying, potentially dearly, for the luxury of a loan without income verification.  For those reasons, I dismissed Count I.

The Parkers' claim the same four lending institutions failed to recognize their right of rescission fails because they did not act within three days of the settlements.  Because I have found the Parkers received the requisite notice of their rights to rescind, the three-day time limit applies. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(3).[9]  Because the Parkers received the required TILA notices and failed to rescind within three days, I found in favor of the four lending institution on Count II of the Amended Complaint under Rule 52(c).

The RESPA claim in Count III against three of the lending institutions, Washington Mutual, Countrywide, and Indymac, fails on different grounds for each Defendant.  Washington Mutual responded in timely fashion to the Parkers' attorney's letter. Second Amended Complaint, Ex. F.

---

[9]If the lender fails to meet the disclosure requirements of the TILA, the rescission period becomes three years. 15 U.S.C. § 1635(f).  Even were it not so, the Parkers each testified they did not have the money to effectuate a rescission.  The equitable goal of rescission under TILA is to restore the parties to the "status quo ante." *Yamamoto v. Bank of New York*, 329 F.3d 1167, 1172 (9th Cir. 2003); *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992).  When a borrower is unable to tender the loan proceeds, the remedy of unconditional rescission is inappropriate. *American Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 820-21 (4th Cir. 2007).

The Countrywide entity which owns the Parkers loan was never properly identitifed or served, despite repeated statements by a Countrywide Home Loan attorney that his client did not own the Parkers' loan.[10]  An entity not served cannot be held liable. Fed. R. Civ. P. 4(m).  Indymac was only served with a demand for  information under RESPA on December 7, 2007, ten days before the start of trial.   RESPA gives a lender 60 days to respond to a qualified written request which gives Indymac until sometime in February, 2008 to respond. 12 U.S.C. § § 2605(e) and (f).   Because the Parkers were unable to prove any violation of RESPA, I granted judgment for the three Defendants on Count III.

The Parkers failed to point with the requisite clarity to any action by Lancealott Financial Group Inc. which would support their common law fraud claim in Count IV.  To void a contract due to a fraudulent misrepresentation, the party alleging fraud must prove, by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance.  *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999); *Gibbs v. Ernst*, 647 A.2d 882, 889 (1994).  All of these elements must be present to warrant the extreme sanction of voiding a contract.  *Porreco v. Porreco*, 811 A.2d 566, 570-71 (Pa. 2002).  The Parkers may believe Weinstein misled them at settlement; they failed to prove any statement was made with knowledge of its falsity or with reckless disregard for its truth or falsity.

Count IV also alleges Weinstein violated Pennsylvania's Credit Services Act, 73 Pa.C.S. §§

---

[10]The Parkers received a letter from Countrywide Bank on November 6, 2007 responding to a request for information.  A month later, 10 days before trial, the Parkers sought to amend their Complaint to include Countrywide Bank.  In light of the outcome of this case, no amendment is warranted.

2183(3), 2184, 2185, and 2186 and the Loan Broker Trade Practices Regulations, 37 Pa. Code §§ 305.3(a)(1) - (a)(4).  Weinstein is a licensed mortgage broker, regulated by the Pennsylvania Department of Banking.  The Credit Services Act explicitly exempts "[a]ny person organized, chartered or holding a license or authorization certificate to make loans or extensions of credit pursuant to the laws of the Commonwealth or the United States who is subject to regulation and supervision by an official or agency of the Commonwealth or the United States."  73 P.S. § 2182.[11]  Similarly the Loan Broker Trade practice Regulation does not apply to "a person, copartnership, association or corporation expressly regulated by a regulatory body or officer of this Commonwealth or of the United States, such as State and nationally chartered banks, savings and loan associations and their regulated subsidiaries." 37 Pa. Code § 305.2 (2007).   The Pennsylvania Department of Banking lists Lancealott Financial Group as a licensed first mortgage broker and a licensed secondary mortgage broker, a fact of which I may take judicial notice.  Federal Rule of Evidence 201 permits a court to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 (3d Cir. 2007);  *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000). Lancealott, the only Defendant named in Count IV, is licensed by the Pennsylvania Department of Banking and is exempt from the statute and the regulation.  For that reason I granted  Lancealott's Rule 52(c) motion at the close of the Parkers' evidence.

Because the Parkers failed to produce any credible evidence in support of their claims, I granted the Defendants' Rule 52(c) Motions.  In light of this Court's ruling, MortgageIT withdrew its counterclaim against Lancealott.  The case is closed and an appropriate order follows.

---

[11] Act of 1992, Dec. 16, P.L. 1144, No. 150, § 2.